In re Clifford Edward BRINER, Jr., and Janice Faye Briner, Debtors,

Clifford Edward BRINER, Jr., and Janice Faye Briner, Plaintiffs,

v.

Alan CHARNES, Director of Revenue, State of Colorado, and Motor Vehicle Division, Department of Revenue, State of Colorado, Defendants.

Bankruptcy No. 81 K 0533.

United States Bankruptcy Court, D. Colorado.

May 6, 1981.

---

Richard M. Borchers, Westminster, Colo., for plaintiffs.

Richard H. Forman, Asst. Atty. Gen., State of Colorado, Denver, Colo., for defendants.

## MEMORANDUM

GLEN E. KELLER, Jr., Bankruptcy Judge.

Plaintiffs seek to enjoin the State of Colorado from suspending the driver's license of Plaintiff Clifford Briner under provisions of the Colorado Motor Vehicle Financial Responsibility Act §§ 42–7–101, *et seq.*, C.R.S.1973. The matter is before the Court upon stipulated facts, a brief recitation of which is important to the understanding of the legal issues involved here.

Clifford Briner is a truck driver and has been so employed during his entire adult life. In recent years, he has developed an alcohol problem and on August 4, 1980, was involved in a motor vehicle accident in which he apparently struck two parked vehicles, causing substantial damage. Thereafter, the State suspended the driving privileges of Mr. Briner for violation of the Uniform Safety Code of 1935 and, in particular, § 42–2–123, C.R.S.1973. Subsequently, the Department issued a provisional license to Mr. Briner permitting him to drive in connection with his employment, to and from an alcohol treatment program, and in connection with his volunteer work as an ambulance driver in his community. Subsequent to the issuance of such provisional license, the State invoked the provisions of the Financial Responsibility Act, the purpose of which the Legislature declared at § 42–7–102, C.R.S.1973:

*Legislative declaration.* The general assembly is acutely aware of the toll in human suffering and loss of life, limb, and property caused by negligence in the operation of motor vehicles in our state. Although it recognizes that this basic problem can be and is being dealt with by direct measures designed to protect our people from the ravages of irresponsible drivers, the general assembly is also very much concerned with the financial loss visited upon innocent traffic accident victims by negligent motorists who are financially irresponsible. In prescribing the sanctions and requirements of this article, it is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists.

The provisions of that Act provide that the individual charged in connection with an accident must demonstrate that he had insurance in effect at the time of the accident or he must post a bond with the State in the approximate amount of $4,000.00 to indemnify the damaged parties against loss. He may also satisfy the provisions of the Act by obtaining a release from the other parties damaged in the accident or he may request a hearing and demonstrate that he was free from fault and, therefore, incurred no liability. No liability insurance was in effect at the time of the accident insuring Mr. Briner, and he was unable to meet any of the other requirements to avoid the impositions of the sanctions under the Motor Vehicle Responsibility Act. On February

27, 1981, the State suspended his driving privileges. Within a few days, a petition under Chapter 13 of Title 11, United States Code, was filed with this Court, and the complaint seeking injunctive relief was also filed. The Chapter 13 plan proposed by the Debtors would pay, within the time of the plan, 100% of the Debtors' obligations, both secured and unsecured. It is, of course, conditioned upon the ability of the Debtor to maintain employment. At the time of the filing of the case, the Debtor had obtained appropriate liability insurance to provide coverage in the event of any future motor vehicle liability.

The Colorado Motor Vehicle Financial Responsibility Act provides at § 42–7–402(2): "A discharge in bankruptcy following the rendering of any such judgment shall relieve the judgment debtor from any of the requirements of this article." This provision is consistent with the requirements of *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). In that case, the Supreme Court held that an Arizona law which continued to suspend the driving privileges after discharge in bankruptcy was impermissible and overruled two prior pronouncements of the court. *Kesler v. Department of Public Safety,* 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962); and *Reitz v. Mealey,* 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21 (1941). The Court said:

> We can no longer adhere to the aberrational doctrine of *Kesler* and *Reitz* that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law. In view of the consequences, we certainly would not apply the *Kesler* doctrine in all Supremacy Clause cases. Although it is possible to argue that *Kesler* and *Reitz* are somehow confined to cases involving either bankruptcy or highway safety, analysis discloses no reason why the States should have broader power to nullify federal law in these fields than in others. Thus, we conclude that *Kesler* and *Reitz* can have no authoritative effect to the extent they are inconsistent with the controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.

The situation here is, of course, different. Under the provisions of Chapter 13 of the Bankruptcy Code, a discharge issues at the time the plan is fully completed. 11 U.S.C. § 1328. The plan in this case will require approximately three years to make payment in full. The State argues that under *Perez* and under its statute, it must suspend the license for the statutory one-year period unless the issuance of a discharge occurs prior to that time. That view fails to take into account the provisions of 11 U.S.C. § 525:

> Except as provided in Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§ 499a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. §§ 181–229), and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C. § 204), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has

been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

The State argues, with some plausibility, that § 525 is not dispositive because the suspension is not solely based upon the failure to pay a dischargeable debt, pointing to § 42–7–406, which permits the State to require that proof of future financial responsibility be given. That is defined in the statute as insurance meeting the limits of the statute, which must be maintained in effect for at least three years following the reinstatement of the license. As has been noted, however, the Debtors have obtained such insurance, and, thus, the only ground of the State's present insistence upon suspension is the failure to pay the liability from the accident.

Chapter 13 of the Bankruptcy Code was designed to encourage the repayment of debt by debtors as a more palatable option than simply seeking a discharge in a Chapter 7 liquidation proceeding. That philosophy is well expressed in Senate Report No. 95–989, 95th Cong., 2nd Sess. (1978), at Page 13, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5799:

> The new chapter 13 undertakes to solve these problems insofar as bankruptcy law can provide a simple yet precise and effective system for individuals to pay debts under bankruptcy court protection and supervision. The new chapter 13 will permit almost any individual with regular income to propose and have approved a reasonable plan for debt repayment based on that individual's exact circumstances. As in current law, 100 percent payment plans will be encouraged by the limitation on availability of a subsequent discharge in section 727(a)(8). This kind of plan has provided great self-satisfaction and pride to those debtors who complete them and at the same time effect a maximum return to creditors.

It is clear that in this case, the suspension of the license by the State removes the sole means of funding the plan proposed by the Debtor and repaying the creditors. It thus appears that the state law and state policy will clearly frustrate the congressional intent of encouraging the repayment of debt, something that is inconsistent with the legislative declaration in the state statute as well as the congressional declaration above referenced. It simply appears to be the precise situation § 525 was designed to remedy, and, accordingly, the Court concludes that in this case, upon these facts, the injunction must issue. It should be noted that as payments progress under the Chapter 13 plan, should there be a default in the plan and the case be dismissed, the injunction should dissolve as the purpose of the Chapter 13 statute will not have been met, and the protections afforded by this Court should not thereafter continue.